IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRANDON VOTAW,**        Case No. 5:18 CV 1358

    Plaintiff,        Judge Donald C. Nugent

    v.        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.        **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Brandon Votaw ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 14, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in June 2015, alleging a disability onset date of February 15, 2015. (Tr. 185-86). His claims were denied initially and upon reconsideration. (Tr. 102, 118). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 128-29). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 8, 2017. (Tr. 53-86). On October 16, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-44). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on June 14, 2018. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Testimony

Born in 1984, Plaintiff was 30 years old at his alleged onset date. *See* Tr. 42, 185. At the time of the hearing, he lived with his fiancé and her seven-year-old son. (Tr. 60). Plaintiff had past work as a cook. (Tr. 61-64).

Plaintiff believed he was unable to work due to problems walking, difficulty moving his hands and feet due to numbness, swelling, and stiffness, as well as back issues, anxiety, and depression. (Tr. 65).

Plaintiff presented to the August 2017 hearing using a recently-prescribed wheeled walker, and otherwise used a cane, due to peripheral neuropathy and lumbar stenosis. *See* Tr. 58, 71-73. Plaintiff testified his physicians were not certain what caused his neuropathy. (Tr. 71). He started using a cane from his grandmother around 2015 or 2016; the cane was not prescribed, but no physician ever told him not to use it. (Tr. 71-72). Plaintiff testified he had fallen "at most" ten times since late 2015. (Tr. 73). He started using the walker – prescribed by Dr. Erin Tischner – two months prior. (Tr. 72). Plaintiff elevated his legs about three times per day for about thirty minutes on instructions from Dr. Tischner and his podiatrist; he had swelling worsened by humid weather. (Tr. 65, 74-75).

---

1. Plaintiff only challenges the ALJ's evaluation of his physical, not mental impairments. *See* Doc. 13, at 3 n.2. Therefore, the undersigned only summarizes the records and testimony relevant to his arguments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

Plaintiff testified to difficulty climbing stairs in his home. *See* Tr. 73 ("A lot of time it feels like my legs were like heavy weight, dead weight, just trying to get them to lift up to go. Sometimes I'll get like stabbing pain as I do that."). Due to this, he slept downstairs "at most" twice per week. (Tr. 73-74). When asked if he could stand independently without holding on to something, he responded: "It seems like I'm usually always holding onto something." (Tr. 74).

Plaintiff had a driver's license and was able to drive. (Tr. 61). However, driving caused stiffness in his feet, and he experienced numbness in his legs and lower back after about 30 to 45 minutes. (Tr. 70). Plaintiff went to the gym five days per week for 45 minutes to one hour; he did water aerobics on two or three days, and seated "light lifting" five days per week. (Tr. 66). He also sometimes rode a stationary bicycle. (Tr. 77). He also looked after his stepson when he was not in school. (Tr. 66).

On a typical day, Plaintiff got up, showered, and "tr[ied] to straighten up the house". (Tr. 65). He testified he could mop and do laundry (though someone else carried the basket). (Tr. 66). He sometimes made dinner (Tr. 66), but his fiancé did the grocery shopping (Tr. 68). Plaintiff enjoyed cooking (Tr. 68-69), but experienced numbness and tingling in his legs when standing to cook, so he rested in a chair, or prepared some of the meal while sitting or holding his walker (Tr. 76). Plaintiff estimated he could sit for 30 to 45 minutes. (Tr. 70). He estimated he could stand for 15 to 20 minutes, while holding onto his walker, and walk for 10 to 15 minutes with the walker. (Tr. 77).

Relevant Medical Evidence

In February 2015, Plaintiff went to the emergency room with anxiety symptoms (Tr. 316)[2]; Providers recommended psychiatric follow-up. (Tr. 290).

---

2. The date of this visit coincides with Plaintiff's alleged onset date. *See* Tr. 185.

3

In August 2015, Plaintiff underwent a consultative examination with Charles Frommelt, D.O. (Tr. 323-25). Plaintiff complained of panic attacks and right lower extremity problems. (Tr. 323). He reported problems with his right leg for the prior 18 years, but denied falls, weakness, or paresthesia. *Id.* Dr. Frommelt noted Plaintiff's gait was abnormal, favoring his right leg and walking on the lateral aspect of his foot; his stride was shortened. (Tr. 325). He had some decreased range of motion in his right leg, but normal sensation, strength, and reflexes. (Tr. 324-25).

Later in August 2015, Plaintiff established care with Heather Williams, F.N.P. (Tr. 392-96). He reported paresthesia in his legs which began a few months prior, and paresthesia in his left arm that began a few weeks prior. (Tr. 392). It was worse with walking and standing, and relieved by sitting with his feet up. *Id.* He reported difficulty going up stairs, but attributed that to his weight. *Id.* On examination, Ms. Williams noted Plaintiff had pain with palpation and with range of motion in his lower back, and he was unable to perform a straight leg raise. (Tr. 393). Ms. Williams assessed, *inter alia*, paresthesia and back pain; she prescribed Naproxen, and ordered lab work. (Tr. 394).

An October 2015 ankle brachial test showed no evidence of significant peripheral arterial disease in Plaintiff's legs. (Tr. 399). A nerve conduction study revealed normal sensory responses, but motor nerves with reduced amplitude which "can be consistent with axonal loss or muscle atrophy." (Tr. 397). An electromyogram ("EMG") "suggest[ed] a peripheral neuropathy that is axonal." (Tr. 398)[3].

---

3. Specifically, the EMG showed "increased insertional activity with tiny fibrillation potentials in the foot muscle" and "some decreased recruitment of normal motor unit potentials in the right foot"; it revealed "increased insertional activity in the foot muscle with some rare positive waves" in the left foot. (Tr. 398).

4

Plaintiff next saw Erin Tischner, D.O. in February 2016. (Tr. 436-38). He complained of, *inter alia*, bilateral lower extremity paresthesia "which [had] been present for years". (Tr. 436). She noted Plaintiff had recently begun taking gabapentin. *Id.* Dr. Tischner noted "bilateral trace edema" in Plaintiff's legs. (Tr. 437). She assessed, *inter alia*, unspecified polyneuropathy and low back pain, instructed Plaintiff to increase his gabapentin, and ordered a lumbar spine MRI. (Tr. 437-38). Dr. Tischner noted that labs and a lumbar spine x-ray did not show any explanation for Plaintiff's neuropathy. (Tr. 438).

The following month, Plaintiff reported low back pain, as well as weakness, numbness, and paresthesia in his legs. (Tr. 433). On examination, Dr. Tischner noted exaggerated lordosis in Plaintiff's lower back and paraspinal spasm. (Tr. 434). She continued to diagnose unspecified polyneuropathy and refilled Plaintiff's gabapentin prescription. *Id.*

Also in March 2016, Plaintiff saw endocrinologist Ahmad Al-Shoha, M.D., for hyperthyroidism. (Tr. 460-69). On examination, Dr. Al-Shoha noted normal strength, reflexes, coordination, and gait; however, Plaintiff also had decreased sensation in both feet. (Tr. 466).

An April 2016 MRI showed multilevel discogenic changes with bilateral recess stenosis at L3-L4 and mild central canal stenosis at L4-L5 and S1, as well as foraminal encroachment on the left at L3-L4. (Tr. 442).

Plaintiff underwent an orthopedic consultation with Rajiv Taliwal, M.D., in June 2016. (Tr. 415-19. Plaintiff "ambulate[d] with difficulty", with an "antalgic and waddling gait" on both sides. (Tr. 417). His posture was noted to be "unbalanced". *Id.* Plaintiff used a cane "for mobilization" and reported falling twice within the prior six months due to "legs giving out". (Tr. 415). On examination, Plaintiff had stiff and painful range of motion in his low back, but full muscle strength, normal sensation, and normal reflexes in the legs. (Tr. 417-18). Dr. Taliwal assessed

5

spinal stenosis of the lumbar region, and degeneration of the lumbar or lumbosacral intervertebral disc. (Tr. 418). He advised Plaintiff to take over-the-counter anti-inflammatory and pain medications, and to continue a home exercise program; he also noted Plaintiff "may benefit from [physical therapy] and weight loss as well as epidural injections." *Id.*

Plaintiff also returned to Dr. Tischner in June 2016 with continued complaints of pain, weakness, numbness, and paresthesia in his legs. (Tr. 429). Plaintiff neurological examination revealed no focal signs. (Tr. 430). Dr. Tischner continued to diagnose unspecified polyneuropathy and low back pain, and refilled Plaintiff's gabapentin prescription. *Id.*

In July 2016, Plaintiff saw Justin Drummond, M.D., a pain management physician, for low back pain. (Tr. 451-54). Plaintiff reported low back pain radiating to his hips, worse with standing, lifting, and walking. (Tr. 451). He also reported neuropathy in his feet, and minimal relief from gabapentin and naproxen. *Id.* Dr. Drummond noted Plaintiff moved around the room "with difficulty", had pain with palpation and facet loading, and had a positive straight leg raise test bilaterally. (Tr. 451-53). Dr. Drummond described Plaintiff's gait as "very abnormal . . . right knee straight out without bending with a cane." (Tr. 453). He had diminished sensation to light touch in his left lateral leg, and "was grunting", but able to support his weight when standing. *Id.* He had normal patellar reflexes. *Id.* Dr. Drummond noted Plaintiff's "exam[ination] seem[ed] disproportionate to EMG and MRI findings as patient struggled with dorsiflexion and extension/flexion at knees." *Id.* Dr. Drummond assessed other chronic pain, and observed Plaintiff "use[d] a cane for ambulation secondary to pain." *Id.* Dr. Drummond noted Plaintiff had been referred for consideration of lumbar epidural steroid injections, but Plaintiff "would like to think about it". (Tr. 454).

6

At an endocrinology visit in July 2016, Dr. Al-Shoha noted similar physical findings to his previous visit, including continued decreased sensation in Plaintiff's feet. (Tr. 477).

Plaintiff returned to Dr. Drummond in August 2016, reporting back pain and difficulty walking. (Tr. 448). Dr. Drummond made physical findings similar to those from July. *Compare* Tr. 449 *with* Tr. 453. He again noted the examination "seem[ed] disproportionate" to the EMG and MRI results. (Tr. 449). Dr. Drummond noted Plaintiff was recommended to see a neurologist for further workup "as etiology of issues are uncertain." (Tr. 449-50). He also recommended a trial of Lyrica, but Plaintiff wished to discuss it with his primary care doctor. (Tr. 450).

In October 2016, Plaintiff saw Dr. Tischner for a follow up. (Tr. 426-27). Dr. Tischner noted Plaintiff had lost weight doing water aerobics and diet modification; she opined his obesity was the cause of his low back pain. (Tr. 426). Plaintiff complained of left foot pain with bruising after a fall, as well as numbness and tingling. *Id.* Dr. Tischner ordered x-rays of Plaintiff's left foot and ankle, which she noted revealed no fractures, but mild degenerative changes which were "a chronic issue and . . . likely caused by the numbness of his feet and changes of weight distribution." (Tr. 427).

Plaintiff returned to Dr. Al-Shoha in January 2017 for follow-up on his hyperthyroidism. (Tr. 482-90). Plaintiff had lost 64 pounds since his prior visit with diet and "exercising at the gym 3-4 days a week". (Tr. 483). On examination, Dr. Al-Shoha noted Plaintiff had normal strength, coordination, and reflexes, but decreased sensation in both feet. (Tr. 488). Dr. Al-Shoha also noted an abnormal gait and that Plaintiff "use[d] a can[]e because of neuropathy". *Id.*

In February 2017, Plaintiff saw podiatrist Gina Tomsho, D.P.M. (Tr. 491). He reported a history of progressive neuropathy in his bilateral lower extremities, causing leg and gait weakness, and noted he used a cane because he had fallen due to weakness. *Id.* Plaintiff reported he did water

7

aerobics, and went to the gym but "can really only do upper body exercises". *Id.* On examination, Dr. Tomsho observed a loss of "protective sensation" and muscle strength in Plaintiff's feet, reduced foot and ankle range of motion, calf muscle atrophy, and hyporeflexia. *Id.* Plaintiff had no hip or knee flexion with his gait, and his gait "appear[ed] shuffled in nature with lateral foot strike and medial foot slapping the floor." *Id.* Dr. Tomsho recommended "he continue with cane to prevent falls" and noted he might need a walker if his condition progressed. (Tr. 492).

That same month, Plaintiff saw Dr. Tischner for a follow-up. (Tr. 424-25). He reported paresthesia in both feet and legs. (Tr. 424). Plaintiff reported seeing a neurologist and having a nerve conduction test / EMG scheduled for the following month. *Id.* He was also in aquatic therapy and seeing a podiatrist. *Id.* He "use[d] a came to walk and ha[d] difficulty walking long distances." *Id.* He "denie[d] any falls but ha[d] caught himself before". *Id.* Dr. Tischner noted "gait abnormalities" and a "swinging" gait. *Id.* On examination, Dr. Tischner noted proximal muscle weakness in Plaintiff's bilateral lower extremities, and symmetric, exaggerated (3/4) patellar reflexes. *Id.* Dr. Tischner prescribed a handicap placard, and continued to diagnose unspecified polyneuropathy. (Tr. 425).

Plaintiff returned to Dr. Tischner in June 2017. (Tr. 421-22). Dr. Tischner noted Plaintiff had a gait disorder of unknown etiology and had "a few falls" three months prior. (Tr. 421). She noted he was "currently using cane with movement and does not feel that he is sturdy enough for his weight." *Id.* On examination, Dr. Tischler noted normal patellar reflexes, proximal and distal lower extremity muscle weakness, and muscle atrophy. *Id.* She assessed polyneuropathy and "other abnormalities of gait and mobility". (Tr. 422). Under the plan for the latter, she noted: "Start Cane, Walking cane" and "Start Walker with Wheels & Seat, as directed". *Id.*

8

*Opinion Evidence*

After his August 2015 consultative examination, Dr. Frommelt first repeated Plaintiff's statement that "he can stand for about 15 minutes before he has to sit and he can sit for at least an hour." (Tr. 325). He then opined Plaintiff could stand for fifteen to thirty minutes, and sit for one hour. *Id.* He specifically noted: "I do recommend he have frequent breaks, but he can stand about fifteen minutes to half an hour and sit for an hour before having to switch. *Id.*

In January 2016, Bradley Lewis, M.D., reviewed Plaintiff's records and opined Plaintiff could occasionally lift twenty pounds, and frequently lift/carry ten. (Tr. 111-12). He opined Plaintiff could stand or walk four hours in an eight-hour workday, and sit for six hours. *Id.* He was limited to frequent pushing and pulling with the bilateral lower extremities, and had some postural limitations. (Tr. 111-12),

VE Testimony

At the hearing, the ALJ the VE testified that an individual of Plaintiff's age, education, experience and residual functional capacity ("RFC") (as determined by the ALJ) could perform work as a table worker, final assembler, or bonder. (Tr. 80-82). When Plaintiff's counsel asked the VE to add a limitation wherein the hypothetical individual was unable to use his hands while standing to complete any tasks (because, e.g., "he's leaning up against the table"), the VE testified that no jobs would be available to such an individual without special accommodation. (Tr. 83-84).

ALJ Decision

In her October 16, 2017 decision, the ALJ found Plaintiff met the insured status requirements for DIB through March 30, 2020, and had not engaged in substantial gainful activity since February 15, 2015, his alleged onset date. (Tr. 17). She found Plaintiff had severe impairments of degenerative disc disease and stenosis of the lumbar spine, peripheral neuropathy

of the bilateral lower extremities, obesity, depression, and anxiety, *id.*, but that these impairments – singly or in combination – did not meet or equal the severity of a listed impairment (Tr. 22). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)—including the exertional abilities to lift and/or carry no more than 10 pounds occasionally and less than 10 pounds frequently, to push and/or pull with the bilateral upper extremities unlimited other than as limited for lifting and/or carrying, and to stand and/or walk for no more than 2 hours of an 8-hour workday—except that he can never operate foot controls bilaterally and can only occasionally perform any other type of pushing and/or pulling with the bilateral lower extremities; and while able to sit for 6 total hours of an 8-hour workday, he requires the option to alternate to a standing position once every 30 minutes of sitting, and can remain standing for 5 minutes at the workstation before he is able to return to sitting position.
>
> In addition, the claimant is further limited in the following nonexertional abilities:
> - Can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl;
> - Can never work at unprotected heights or around moving mechanical parts; and
> - Is limited to performing simple, routine, and repetitive tasks; can have only occasional interactions with supervisors, with coworkers, and with the public; and can tolerate few changes in a routine work setting.

(Tr. 26-27). The ALJ then found Plaintiff unable to perform any past relevant work (Tr. 41), but given his age, education, and work experience, concluded he could perform other jobs that exist in significant numbers in the national economy (Tr. 42). Therefore, the ALJ found Plaintiff not disabled. (Tr. 43-44).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

10

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

11

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single challenge to the ALJ's decision. He contends the ALJ's RFC is not supported by substantial evidence because it did not include Plaintiff's need to use a cane while standing or walking. For the reasons discussed below, the undersigned finds the decision supported by substantial evidence and recommends the Commissioner's decision be affirmed.

According to the Sixth Circuit, if a "cane [is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). For an ALJ to find a hand-held assistive device is "medically required", "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. Although the Sixth Circuit has not directly ruled on this issue, other circuit courts have noted the key finding in cases involving assistive devices is documentation "describing the circumstances for which [the assistive device] is needed." *Id.*; *see Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a

12

finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

Courts within the Sixth Circuit have found that lacking such a statement, an ALJ is not required to incorporate the use of an assistive device in the RFC. *See Halama v. Comm'r of Soc. Sec.*, 2013 WL 478966, at *8 (N.D. Ohio) ("[E]ven Halama does not contend that the record contains the unambiguous statement of a physician containing the circumstances under which it would be medically necessary for him to use a cane. Inasmuch as there is no such statement in the record, I find that the decision of the ALJ in this case not to incorporate the use of a cane into the RFC is supported by substantial evidence.") (internal quotation omitted); *see also Salem v. Colvin*, 2015 WL 12732456, at *4 (E.D. Mich.) ("Neither the cane prescription nor treatment records . . . indicate the circumstances in which Salem might require the use of a cane. As such, Salem's argument that the need for a cane might erode the occupational base of sedentary work is without support.") (transcript citation omitted); *Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 37382790, at *13 (N.D. Ohio) ("As there is no medical documentation establishing that Mitchell required the use of a cane and describing the circumstances when it is needed, the ALJ did not err by omitting the use of a cane from his hypothetical questions to the vocational expert.").

The ALJ expressly addressed her finding in this case that the cane was not medically necessary, and therefore not included in the RFC:

13

> Turning to the assertion that the medical records consistently document "the need for a cane of walker," the undersigned does not agree with counsel on that point and finds at most a recently documented use of the cane and a physician's mere accommodation of the claimant's own request for the walker at a point two months before the hearing (Ex. 14E/2). By contrast, there are signs of abnormal gait as contended, but the disproportionate clinical presentation flagged by Dr. Drummond and the mild degree of axonal peripheral neuropathy shown on the EMG and nerve conduction study do not support that, when standing, walking, and balancing only occasionally and thus for at most two cumulative hours of an eight-hour workday, the claimant does not have a medically necessary use of a cane or the recently prescribed walker for supporting those exertional and postural abilities.
>
> In this regard, therefore, the claimant's alleged limitation in standing or walking for 10-20 minutes <u>but only with</u> the cane/walker is not consistent with the medical evidence as a whole and, as discussed in a later section of [t]his Finding is not consistent with his daily activities. The claimant's testimony that he "never" fell with the cane but did fall 10 total times, as recently as three months ago, also counters the suggested need for the cane or the walker to support only occasional work activity done while standing or walking.

(Tr. 31) (emphasis in original). Plaintiff argues the reasons provided by the ALJ are not supported. However, the undersigned finds these, and reasons the ALJ provided elsewhere throughout in her decision, provide substantial evidence for the decision not to include a cane in the RFC.

First, the ALJ explained that the record did not consistently document the need for, or even use of, a cane or walker. This is supported by the record, as referenced in the ALJ's discussion earlier in the opinion at Step Two, and throughout her discussion of the record at Step Four. *See* Tr. 23, 28-31, 38. In her Step Two analysis of whether Plaintiff's peripheral neuropathy met Listing 11.14's requirements, the ALJ explained:

> The recent prescription of the walker considered, the objective medical evidence does not support an inability to stand up from a seated position, and once standing, to maintain an upright position without assistance of the walker or other supports. Likewise, the evidence does not support an inability to maintain an upright position while standing or walking without the walker or other assistive device[.]

(Tr. 23). In support, the ALJ cited three visits to Dr. Al-Shoha (in March 2016, July 2016, and January 2017), in which Dr. Al-Shoha noted Plaintiff had normal coordination, lower extremity

14

strength, and lower extremity reflexes and "only mention use of a cane 'because of neuropathy' at the third visit." *Id.*; *see* Tr. 466, 477 (March and July 2016 visits which also note a normal gait); Tr. 488 (January 2017 visit noting "Gait (uses a can[]e because of neuropathy (? from back problem)) abnormal."). She also cited an examining psychologist's August 2015 notation that Plaintiff had a "slightly antalgic gait" (Tr. 29); *see* Tr. 362 ("He walked with a slightly antalgic gait."). This record similarly does not document the use of a cane. *See* Tr. 358-64.

Additionally, throughout the Step Four RFC evaluation, the ALJ explained where she found the record inconsistent with Plaintiff's asserted need to include the cane in the RFC. For example, while acknowledging that it was from early in the record, she cited Dr. Frommelt's August 2015 examination findings of an abnormal gait, but full muscle strength in the lower extremities, full range of motion in the ankles, intact sensation, symmetric reflexes, and negative Romberg sign. (Tr. 29) (citing Tr. 324-26, 329). She noted that these "objective findings are not consistent with the rather extreme degree of alleged functional limitations in terms of standing/walking without a cane". *Id.* The ALJ further noted that "[d]espite the claimant's profession to the contrary, no 2016 office visits with Dr. Tischner reflect the observed or reported use of a cane for support of standing/walking." (Tr. 30). Again, this is accurate. Although Plaintiff reported neuropathy symptoms to Dr. Tischner at visits in February, March, June, and October 2016, there is no mention of an assistive device. *See* Tr. 426-38. The ALJ also again cited the fact that Dr. Al-Shoha did not mention use of a cane at Plaintiff's March and July 2016 visits, but did note it at the January 2017 visit. (Tr. 30) (citing Tr. 466, 477, 488).

The ALJ acknowledged that Plaintiff self-reported (and providers noted) use of a cane at visits in February 2017. *Id.*; *see* Tr. 491 (Dr. Tomsho's stating that Plaintiff "notes he has been using a cane [because] without it, he has suffered falls [due to] his weakness."); Tr. 424 (Dr.

15

Tischner's note that Plaintiff "is currently using a cane which has helped" to avoid falls). Dr. Tomsho endorsed the use of the cane, *see* Tr. 492 ("[A]t this time I rec[ommended] he continue with cane to prevent falls, may need to use walker at some point if this progresses."), and Dr. Tischner prescribed a handicap placard, *see* Tr. 425.

Moreover, the ALJ acknowledged Dr. Tichner's prescription for a walker and cane in June 2017. (Tr. 31); *see* Tr. 422 ("Start Cane, Walking cane, 1"; "Start Walker with Wheels & Seat, as directed,[.]"). Dr. Tischner's notes from this visit indicate that Plaintiff was "using a cane with movement and does not feel that he is sturdy enough for his weight." (Tr. 421). Given this note, the ALJ reasonably interpreted the prescription for a walker as "a physician's mere accommodation of the claimant's own request for the walker at a point two months before the hearing." (Tr. 31).

Second, the ALJ cited Dr. Drummond's statement that Plaintiff's physical examination was "disproportionate" to the EMG findings. (Tr. 31); *see* Tr. 449 ("exam[ination] seems disproportionate to EMG and MRI findings as patient struggled with dorsiflexion and extension/flexion at knees."). Plaintiff specifically takes issue with the ALJ's characterization of the EMG findings as "mild", as that word does not appear in the EMG results themselves, nor in any physician's interpretation thereof. Specifically, the ALJ stated, "but the disproportionate clinical presentation flagged by Dr. Drummond and the mild degree of axonal peripheral neuropathy shown on the EMG do not support that, when standing, walking, and balancing only occasionally and thus for at most two cumulative hours of an eight-hour workday, the claimant does not have a medically necessary use of a cane or the recently prescribed walker for supporting those exertional and postural abilities." (Tr. 31). Plaintiff is correct that the word "mild" is nowhere referenced. However, reading the ALJ's decision as a whole, the undersigned finds no reversible

16

error. First, earlier in the opinion, the ALJ explained that "Dr. Drummond reviewed the results of the October 2015 EMG and nerve conduction study and found the examination 'disproportionate' to the peripheral neuropathy." (Tr. 30) (citing Tr. 453). And later in the opinion when discussing Plaintiff's need for breaks, the ALJ explained:

> Any pain-caused or other symptom-caused need to take frequent "rest breaks'" during a given eight-hour workday is also not proportionate with the mild degree of degenerative disc disease and stenosis of the lumbar spine shown on the April 2016 MRI and with the comparably mild degree of axonal peripheral neuropathy shown on the October 2015 EMG and nerve conduction study of the bilateral lower extremities, per Dr. Taliwal expressly and per Dr. Drummond when stating the claimant's clinical presentation was disproportionate thereto.

(Tr. 38). Taken together, the undersigned finds the ALJ's statement that the EMG results were "mild" is reasonably interpreted as a statement that they were comparatively "mild*er*" than the presentation to Dr. Drummond. *See id.* ("per Dr. Drummond when stating the claimant's clinical presentation was disproportionate thereto").

Plaintiff also takes issue with the ALJ's reliance on Dr. Drummond's notes at all with respect to peripheral neuropathy because he contends Dr. Drummond was only evaluating Plaintiff's need for pain management as to his back and not evaluating neuropathy. *See* Doc. 13, at 10) ("When reading Dr. Drummond's progress note in context, it appears that Dr. Drummond was focused on Plaintiff's back pain[.]"); *id.* at 14 ("For the ALJ to grasp on to a vague and ambiguous comment from the pain management physician evaluating whether epidural steroid injections would be appropriate, and to self-interpret the findings of an EMG, is wholly insufficient to uphold a finding that the cane is not necessary."). However, the undersigned agrees with the Commissioner (Doc. 17, at 8-9) that another – equally reasonable – interpretation is that Dr. Drummond was evaluating both Plaintiff's back pain and neuropathy. This is so because Dr.

Drummond listed the reasons for the appointment as "[b]ack pain" and "[d]ifficulty walking". (Tr. 448).

Finally, later in her decision in evaluating medical opinion evidence, the ALJ stated that "the record does not contain any opinions from treating physicians indicating . . . that [Plaintiff] has had a medical necessity to use the cane." (Tr. 38). This is an additional supported reason for the ALJ's decision not to include the cane in the RFC.

The undersigned is left with no doubt that Plaintiff has significant limitations from his neuropathy. And Plaintiff can certainly point to a significant record evidence suggesting he is more restricted than the ALJ determined. But the ALJ imposed a significantly-restrictive RFC, and her decision not to include further limitations is supported by substantial evidence as set forth above. The ALJ acknowledged Plaintiff's limitations and explained:

> The more recent medical findings could suggest a progressive effect of the neuropathy on the claimant's lower extremities, and the undersigned does find within the objective medical evidence a strong base of support of significantly [limited] standing and walking abilities and limitations in the ability to carry even light objects while on his feet and in the abilities to push and pull with the bilateral lower extremities, especially for operating foot controls.

(Tr. 31).

The substantial evidence standard dictates that it is not for this Court to evaluate the evidence anew, and even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. This is the case here, and thus, the undersigned recommends the Court find no error in the ALJ's failure to include the use of a cane for standing and walking during the "no more than 2 hours of an 8-hour workday" the RFC requires. (Tr. 26).

Step Five

Plaintiff frames his final argument as a "Step Five" argument. To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). However, an ALJ is only required to include in the RFC those restrictions he finds credible and supported. *Irvin v. Social Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Plaintiff argues the Step Five determination is this case is not supported because "[t]he vocational expert testified that the inability to use one's hands while standing, once incorporated into the RFC finding, would prevent the availability of jobs in the competitive workplace without accommodations. Thus, the ALJ had no evidence of job incidence data, and Defendant cannot meet her burden at step five of the sequential evaluation process." (Doc. 13, at 14).

But the ALJ disagreed that such a finding was necessary to the RFC, and, as discussed above, her decision in that regard is supported by substantial evidence. Because the undersigned finds the ALJ's RFC in this case is supported by substantial evidence, and the hypothetical question posed to the VE (Tr. 80-82) matches the RFC (Tr. 26-27), there is no Step Five error.

19

**CONCLUSION AND RECOMMENDATION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).